2002 WY 129

**In the Matter of the Worker's Compensation Claim of Mary Ann Miller HOFF, Appellant (Petitioner),**

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).**

No. 01–128.

Supreme Court of Wyoming.

Sept. 4, 2002.

David A. Drell of Vlastos, Henley & Drell, P.C., Casper, WY, Representing Appellant.

Hoke MacMillan, Attorney General; Gerald L. Laska, Senior Assistant Attorney General; and David L. Delicath, Assistant Attorney General, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1]   This is an appeal from a determination of the State of Wyoming, Office of Administrative Hearings (OAH) denying worker's compensation benefits.   We affirm.

### ISSUES

[¶ 2]   Appellant Mary Ann Miller Hoff (Hoff) sets forth the following issue:

* Chief Justice at time of expedited case conference.

1. Whether the Decision and Order Denying Benefits of the Office of Administrative Hearings was arbitrary, capricious and an abuse of discretion, otherwise not in accordance with law and, furthermore, not supported by substantial evidence.

Appellee State of Wyoming ex rel. Wyoming Worker's Compensation Division (Division) phrases the issue:

The Hearing Examiner assigned greater weight to the medical opinion of Dr. Pitzer than to the opinions of Dr. Delgadillo and Dr. Narotzky. Was that assignment contrary to the overwhelming weight of the evidence?

### FACTS

[¶ 3] Hoff sustained a work-related injury on July 25, 1999. She received primarily chiropractic care and consulted with a neurosurgeon. Initially, claims for medical care and temporary total disability were submitted to and paid by the Division. However, on May 15, 2000, the Division issued a Final Determination wherein it denied all claims that were submitted by Hoff after August 31, 1999. This denial was based on a conclusion that all claims after August 31, 1999, were not work related as the work injury of Hoff was resolved, and treatment after August 31, 1999, was for an underlying chronic cervical spine problem experienced by Hoff which affected the neck and right shoulder area unrelated to the work injury.

[¶ 4] Hoff appealed this determination, and a contested case hearing was held before the OAH. The OAH upheld the decision of the Division. Hoff then filed a petition for review before the district court, and this matter was certified directly to this court for appellate review.

### STANDARD OF REVIEW

[¶ 5] Our standard of review when reviewing administrative agency action was recently clarified in the case of *Newman v. State ex rel. Workers' Safety and Compensation Div.*, 2002 WY 91, 49 P.3d 163 (Wyo. 2002). Judicial review of an agency action is directed by Wyo. Stat. Ann. § 16-3-114.[1]

[¶ 6] In appeals where both parties submit evidence at the administrative hearing, *Newman* mandates that appellate review be limited to application of the substantial evidence test. *Newman*, 2002 WY 91, ¶ 22, 49 P.3d 163. This is true regardless of which party appeals from the agency decision. In addition, this court is required to review the entire record in making its ultimate determination on appeal. *Newman*, at ¶ 19 and ¶¶ 24–26.

[¶ 7] The substantial evidence test to be applied is as follows:

In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence.

*Newman*, at ¶ 12 (quoting *State ex rel. Workers' Safety and Compensation Div. v. Jen-*

---

1. Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2001) provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
(B) Contrary to constitutional right, power, privilege or immunity;
(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
(D) Without observance of procedure required by law; or
(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

*sen*, 2001 WY 51, ¶ 10, 24 P.3d 1133, ¶ 10 (Wyo.2001)).

[¶ 8]   Even when the factual findings are found to be sufficient under the substantial evidence test, *Newman* further concludes this court may be required to apply the arbitrary-and-capricious standard as a "safety net" to catch other agency action which prejudiced a party's substantial right to the administrative proceeding or which might be contrary to the other WAPA review standards.   A purely demonstrative listing is provided of situations which could warrant the consideration of the arbitrary-and-capricious standard in addition to the substantial evidence test.[2]   *Newman*, at ¶ 23.   However, this appeal presents no such unique circumstances.

### DISCUSSION

[¶ 9]   Hoff generally argues that the decision of the OAH is not supported by substantial evidence.   First, Hoff asserts that reliance by the OAH on the opinions of Dr. Neil Pitzer is misguided because Dr. Pitzer's opinions were speculative and not supported by substantial evidence.   In particular, Hoff argues that the bulk of medical records reviewed by Dr. Pitzer did not deal with cervical spine issues but with other unrelated back problems suffered by Hoff.   Hoff also contends that the opinions of Dr. Pitzer are contrary to the opinions expressed by Hoff's treating physicians.   Finally, Hoff asserts that she submitted adequate evidence to meet her burden of proof that the work accident caused her injuries and/or materially aggravated a preexisting condition.   Therefore, Hoff argues she is entitled to worker's compensation benefits.

[¶ 10]   Hoff's initial argument is that the OAH erred in finding Dr. Pitzer's opinions more credible than the opinions of Dr. Marc Delgadillo and Dr. Robert A. Narotzky.   Indeed, in the Order Denying Benefits entered by the OAH in this case, the hearing examiner stated:

8.   In weighing the medical evidence, this Office finds Dr. Pitzer's testimony more credible than Dr. Narotzky.   In making his medical opinion, Dr. Narotzky indicates that he reviewed information and his clinic notes, however there is no indication as to what information was review [sic] by him. Dr. Pitzer reviewed extensive medical records and chiropractic records which support his opinion that Hoff's neck and right shoulder problems after August 30, 1999 are the result of her chronic cervical spine condition and not the July 25, 1999 work injury.[3]

[¶ 11]   Review of the record discloses that Hoff was involved in a work-related injury on July 25, 1999, when a chair rolled in front of her causing her to twist but not fall.   On July 31, 1999, Hoff indicated in her Employee's Report of Injury that she had injured both her neck and lower back in this incident and that she had previously injured these areas of her body outside of work.   In addition, at the hearing Hoff testified that at the time of the accident she was primarily concerned with an injury to her lower back as she was then recuperating from a recent surgery to that area of her body.

[¶ 12]   Dr. Pitzer was retained by the Division to perform a medical record review because the Division had concerns that Hoff had a history of considerable preexisting problems.   As a basis for his report, Dr. Pitzer was supplied with extensive medical records to review from the Division.[4]   Dr. Pitzer detailed that Hoff's medical records showed that she was extensively treated due to a motor vehicle accident in June of 1994 where she incurred lumbar spine pain.   X-rays at that time showed multiple level degenerative disc disease and, in December of

---

2.   "For example, the administrative record may be replete with evidence supporting the decision, and yet the agency may have willfully discounted credible evidence, refused to admit certain testimony or documentary exhibits, or failed to provide findings of fact or conclusions of law."   *Newman*, at ¶ 23.

3.   The hearing examiner must have meant to refer to Dr. Delgadillo rather than Dr. Narotzky, as Dr. Delgadillo was the only doctor to testify as a witness at the hearing.   Further, Dr. Pitzer did not actually testify, but his medical record review report was submitted as documentary evidence.

4.   The medical record review report of Dr. Pitzer was admitted into evidence without objection.

1995, Hoff submitted to an L4 through S1 fusion. In August of 1996, Hoff received a surgical revision of the graft site at the right iliac crest and, in December of 1997, repair of the right iliac crest musculature. Hoff then obtained prolotherapy and injections in October of 1998 to the right iliac crest area and had the hardware removed concerning her fusion in April of 1999.

[¶ 13] Dr. Pitzer also indicated that he had reviewed extensive chiropractic notes apparently made by Dr. Delgadillo. These notes, from April through August of 1998, referred to 12 sessions of chiropractic treatment that Hoff received primarily for neck and shoulder pain. Trigger points likewise were established at this time on the right side. These notes also related another automobile accident that Hoff was involved in on October 30, 1998. From that time through June of 1999, Hoff had 17 additional chiropractic treatments, again substantially involving the right neck and right shoulder. In early 1999, Hoff also experienced migraine-like headaches.

[¶ 14] Dr. Pitzer further identified that x-rays taken in April of 1999 showed degenerative changes on multiple levels in Hoff's cervical spine. A cervical MRI, taken in August of 1999 after Hoff's July 25, 1999 work injury, indicated disc changes including midline bulging and spinal canal narrowing at C3 through C7 levels. However, there were no comments on any acute changes suffered by Hoff. Dr. Pitzer also pointed out the findings of Dr. Narotzky during his examination of Hoff, most notably that Hoff had no evidence of radiculopathy. Finally, Dr. Pitzer recognized from his review that both Dr. Narotzky and Dr. Delgadillo had recommended only continuing conservative treatment for Hoff.

[¶ 15] Dr. Pitzer additionally reviewed medical records from the Wyoming Medical Center which made reference to a September 21, 1998 fall down some stairs experienced by Hoff. Notes of Dr. Delgadillo from the period of August 13, 1999, to January of 2000 showed at least 47 chiropractic sessions for headaches, neck and shoulder pain and trapezius symptoms. Dr. Pitzer concluded that the July 25, 1999 work injury may have resulted in some mild aggravation of Hoff's cervical spine symptoms but felt Hoff was receiving treatment under the Wyoming Workers' Compensation system for a chronic problem which was not related to that work injury. In particular, while Dr. Pitzer opined that limited chiropractic treatment of eight to twelve sessions would have been adequate to address any such aggravation, acknowledged that a few sessions of physical therapy were in order, and agreed that the MRI and x-rays taken were reasonably related to the work injury, he ultimately determined that any additional treatment received by Hoff was not related to her work injury but to an established chronic cervical degenerative spine problem effecting her neck and right shoulder area. This opinion was appropriately based on the above-referenced medical history gleaned by Dr. Pitzer from review of Hoff's medical records and characterization that the work injury was a low speed, whiplash type injury without any head trauma or particular neck trauma. Moreover, Dr. Pitzer stated that any of the previous events within Hoff's medical history may have caused her ongoing and chronic neck conditions.

[¶ 16] As ascribed previously, Hoff argues that the bulk of the medical records reviewed by Dr. Pitzer did not deal with cervical spine issues but with other unrelated back problems suffered by Hoff. Certainly, while some of the medical records reviewed by Dr. Pitzer dealt with lower lumbar issues, other medical records dealt specifically with cervical spine related issues which were of direct concern in this manner. Evaluation of those medical records examined by Dr. Pitzer evidences the thoroughness of his review upon which he based his opinion. Finally, we frankly know of no other means by which an appropriate and complete medical records review may be conducted than upon consideration of the past medical history of the person involved.

[¶ 17] Additional evidence exists in the record to support Dr. Pitzer's conclusions.[5] Medical notations concerning Hoff's visit to the Wyoming Medical Center on August 16,

5. Again, each of the documents referred to here-in was admitted into evidence without objection.

1999, reflect only a cervical musculoskeletal strain. On that same date, an x-ray examination of Hoff resulted in a conclusion that no significant change had occurred when compared with a previous study conducted on September 21, 1998. Similarly, the cervical area MRI study taken on that day ended in findings that some of the previous problems noted in an MRI taken on March 28, 1991, were unchanged. Additional problems were also established which supported a determination that Hoff suffered chronic cervical degenerative spine problems effecting her right neck area.

[¶ 18] A cervical discography performed on Hoff on November 22, 1999, ordered by Dr. Narotzky, identified a disc with abnormal appearance, a disc space with abnormal appearance with narrowing and abnormal layering as opposed to pooling centrally in the nucleus and contrast leaking. Given these factors, it was found that Hoff had spurring and leaking consistent with an annular degeneration or tearing at the C4–5 plane, diffuse degeneration of the disc and spurring impinging on the thecal sac at the C5–6 level and degenerative arthritic change with contrast spread consistent at the C6–7 area. Correspondingly, it was noted that Hoff had pain during the injection consistent with some but not all of her previous complaints. Dr. Angelo M. Santiago, a specialist in neurology, conducted a neurologic examination and an EMG study on Hoff on December 28, 1999, concluding that there were no remarkable abnormalities and that he was "uncertain as to what could be really causing Ms. Hoff's constellation of symptomatology aside from a cervical musculo-ligamentous strain." Hence, the opinions of Dr. Pitzer were not misguided, speculative, or unsupported by substantial evidence.

[¶ 19] Furthermore, Hoff also contends that the opinions of Dr. Pitzer are contrary to the opinions expressed by Hoff's treating physicians. Nevertheless, review of the record shows upon examination of Hoff on August 30, 1999, and review of the recent cervical x-rays and MRI taken of Hoff, that Dr. Narotzky recognized Hoff had a history of four operations to her lower back and several surgeries to her iliac crest bone graft site to repair a "slipped muscle." Additionally, the doctor noted degenerative changes, spondylosis with disc bulging, and a combination of osteophyte formation and disc bulging causing mild canal stenosis and associated neural foraminal stenosis within the cervical area of Hoff. Finally, Dr. Narotzky recognized that Hoff suffered from multilevel disease and no evidence of myelopathy or radiculopathy on exam and recommended only continued conservative treatment.

[¶ 20] Dr. Delgadillo, upon his initial examination of Hoff on August 16, 1999, referenced Hoff's degenerative cervical history upon review of x-rays and made a diagnosis of cervical strain. Later, in his Health Care Provider Initial Report of August 20, 1999, Dr. Delgadillo noted right neck and right arm pain but identified that these body parts had been previously injured by Hoff as a result of a prior automobile accident. He then again diagnosed these injuries as a cervical strain. In a letter written by Dr. Delgadillo on October 12, 1999, he further recognized Hoff's degenerative disc disease in the cervical area given the x-ray and MRI results obtained. Dr. Delgadillo similarly stated that Hoff's discogram "showed some major problems" involving the C5–6 disc.

[¶ 21] Review of Dr. Delgadillo's treatment notes concerning Hoff for the period of April 14, 1998, through May 4, 2000, indicates problems experienced by Hoff with her right neck, right shoulder and right arm. In particular, the May 12, 1998 notation reflects Hoff was experiencing soreness and stiffness in the right side of her neck and right shoulder and had difficulty in moving her right shoulder because of an exacerbation of old problems. She was also experiencing spasms in the right side of her neck. These difficulties continued into the following month.

[¶ 22] In November of 1998, Dr. Delgadillo stated in his notations that Hoff was involved in an automobile accident causing her pain, soreness, stiffness and tenderness on the right side of her neck and spasms in her right side trapezius. In March and April of 1999, Hoff experienced right side neck and right shoulder pain with migraine like pain. She also had a tight right trapezius and

shoulder blade with spasms and trigger points.

[¶ 23] Even after the work injury, Dr. Delgadillo referred to further exacerbations to Hoff's difficulties. On October 8, 1999, it was recognized that Hoff experienced a slight exacerbation of unknown origin causing her additional tenderness to the right side of her neck. On October 28, 1999, Hoff was thrown from a chair at work causing her additional problems with her neck. Still, in March of 2000, two separate further exacerbations to Hoff's right cervical area were noted; one of unknown origin and the other caused by Hoff walking and stepping off a curb.

[¶ 24] During his testimony, Dr. Delgadillo explained that he first began seeing Hoff in 1985 for occasional neck pain, headaches and lower back pain. He further confirmed Hoff's 1994 automobile accident and stated that Hoff had fairly involved neck problems that resulted from that accident. Dr. Delgadillo also attested that Hoff complained of neck related difficulties from approximately October of 1998 through April of 1999 prior to the work related injury.[6]

[¶ 25] The record before us does reflect evidence that is contrary to the ultimate decision made by the OAH. For instance, Hoff testified that the symptoms that she experienced after the work injury were different than those symptoms that she had experienced previous to that event. Dr. Narotzky wrote a letter dated November 28, 2000, to Hoff's counsel stating that it appeared that although Hoff had preexisting spondolyosis prior to her work injury, that this work injury caused this previous problem to become symptomatic necessitating treatment with Dr. Delgadillo and himself

from the date of injury at least through mid-October of 2000. Additionally, Dr. Delgadillo testified that he concurred with these statements made by Hoff and Dr. Narotzky. However, this evidence is not of sufficient weight to convince us that the determination of the OAH was incorrect.[7] We, therefore, determine that the findings and rulings reached by the OAH were based on substantial evidence and within established law.

### CONCLUSION

[¶ 26] We hold that the record before us provided a rational basis for the hearing examiner's ultimate findings of fact and conclusions of law. As such, we hold that these findings of fact and conclusions of law were not clearly contrary to the overwhelming weight of the evidence.

[¶ 27] The order denying benefits of the OAH is affirmed.

---

6. Hoff during her testimony admitted to her extensive prior medical history related to her right neck and right shoulder areas and experienced headaches and to those post-work accident incidences she was involved in which exacerbated her subject cervical related work injuries.

7. The record reflects that Hoff responded that she "did not recall" to numerous fact related questions surrounding the subject work accident and her medical history on cross-examination. Yet, Hoff was able to respond with specificity that she had never previously experienced those

difficulties prior to the work accident. Further, Hoff admitted that she had previously spoken to Dr. Narotzky about her workers' compensation related difficulties and that he stated that he would do anything he could to help her with her case. Finally, throughout his testimony, Dr. Delgadillo often became confused, could not keep his notes in order for reference and stated that his opinion was based exclusively on his review of his own notes. These circumstances, of course, may or may not have been considered in weighing overall credibility.